IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                              :   CRIMINAL ACTION
        v.                    :
                              :   NO. 1:10-CR-86-11-RWS-ECS
EDWIN MENJIVAR                :
                              :

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**I.
The Pending Motions Before the Court**

This matter is before the Court on Defendant Menjivar's preliminary motion to dismiss, [368]; motion for bill of particulars, [366]; motion to suppress evidence, [389]; and motion to suppress statements, [390].

**II.
The Preliminary Motion to Dismiss**

In the preliminary motion to dismiss the indictment, Defendant moves to dismiss for failure to provide a speedy trial under the Sixth Amendment and the Speedy Trial Act. Defendant alleges pre-indictment and post-indictment delay and cites Barker v. Wingo, 407 U.S. 514 (1972). Other than alleging that certain of the acts with which Defendant is charged occurred on or about October 31, 2007, and February 28, 2008, the motion is devoid of specifics as to the balancing of factors under Barker. Indeed, Defendant requests that

he be allowed to supplement his motion but has failed to do so since it was filed in September of 2010.

There is nothing to suggest that the indictment was not brought within the applicable statute of limitations. See United States v. Weinstein, 762 F.2d 1522, 1452 (11th Cir. 1985) (statute of limitations provides primary protection against prosecutorial delay). Likewise, there are no facts presented showing that any delay between the date of the indictment on February 24, 2010, and the present was in violation of the Constitution or the terms of the Speedy Trial Act, 18 U.S.C. § 3161 et seq. Under these circumstances, no particularized facts having been stated to establish a colorable claim to a violation of the Constitution or the Speedy Trial Act, based upon pre- or post-indictment delay, **IT IS RECOMMENDED** that the motion, [368], be **DENIED**.

### III.
### Motion for Bill of Particulars

In Defendant's motion for bill of particulars, [366], Defendant requests that the government provide Defendant with two categories of information. First, Defendant requests the names of all unindicted co-conspirators known to the grand jury. Second, Defendant seeks information relating to Count 21 in which Defendant is charged with aiding and abetting the use of a firearm in the commission of a crime of violence. Defendant requests that he be

2

advised of additional facts regarding what he is alleged to have done and how he was aided or abetted by another in the use of the weapon on October 31, 2007. See Def's Request at 2-3, [Doc. 366].

At the outset, Defendant's request, insofar as it seeks disclosure of the identity of unindicted co-conspirators, is unnecessary because this information is already required to be disclosed by the Court's standing Order in this case. As for particulars related to Count 21, the same is hereby **GRANTED**, but only to the extent that the government is **ORDERED** to direct Defendant to the places in the discovery where the essential facts relating to Defendant's involvement in Count 21 are disclosed, within ten (10) days of entry of this Order. If the essential facts are not disclosed in the discovery, then the government is **DIRECTED** to provide this information in the form of a bill of particulars to the Defendant stating what the government contends the essential facts are relating to this Count, also within ten (10) days of entry of this Order.

### IV.
### The Motion to Suppress Evidence and Statements

**A. Background and Contentions**

Defendant filed a motion to suppress search and seizure, [389], and a motion to suppress statements, [390]. The motion to suppress evidence seeks to suppress evidence seized on February 28, 2008, at

3

Defendant's residence at 1120 Forest Vale, Apartment 4, Norcross, Georgia. The items seized included a .38 caliber pistol, ammunition for the pistol, a box of shotgun ammunition, certain papers and documents, and Defendant's cell phone. In the motion to suppress statements, [390], Defendant initially sought to suppress statements made on February 28, 2008, and on December 8, 2009. As for the statements made on February 28, 2008, Defendant now concedes any such statements were non-custodial and do not warrant suppression. Def's Post-Hearing Brief at 11, [554]. As for the motion to suppress the seizure of the cell phone, the government acknowledges that it will not introduce any evidence in its case in chief related to the seizure of the cell phone. Gov't Response at 11 n.1, [561].

With regard to the seizure of the pistol, ammunition, and personal papers and writings, Defendant argues that the officers who seized the property lacked both a warrant and probable cause for the seizures. As for applicability of the "plain view doctrine" to justify the seizure, Defendant argues that the incriminating nature of the items seized were not immediately apparent, even if the officers were lawfully in a place where they were entitled to view the items, and thus the seizure was unwarranted. Def's Post-Hearing Brief at 14.

The government responds that the search of the apartment was conducted pursuant to a valid consent. The government further

4

contends that, shortly after the consent was obtained, Defendant disclosed that a .38 revolver was located in one of the bedrooms of the apartment between the mattresses, which the government seized immediately. The government contends that, even if there was no probable cause to seize the weapon as contraband or evidence, its seizure was justified to protect the officers temporarily while they were in the apartment questioning the occupants. Gov't Response at 8. The government submits that, thereafter, once the Defendant's illegal immigration status was ascertained, the officers developed probable cause to seize and retain the pistol and the ammunition as evidence of a violation of the alien in possession of a firearm statute under which the Defendant was charged and arrested on the scene. Id.; see 18 U.S.C. § 922(g)(5).

Defendant also made a statement on December 8, 2009, to agents of the Immigration and Customs Service ("ICE") while in state custody in the process of being arrested on federal charges. Defendant was administered Miranda[1] warnings in connection with this statement and signed a waiver before he gave his statement. Defendant contends that the waiver and the statement were involuntary because he was not specifically advised that he would be

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

5

questioned regarding his involvement in gang activities. Def's Post-Hearing Brief at 19.

The motions to suppress came on for evidentiary hearing on May 17, 2011, and a transcript of the hearing has now been prepared. [553]. The motions have now been fully briefed and are ripe for consideration by the Court.

**B. Factual Background Surrounding the Search and Seizure on February 28, 2008, and the Statement of December 8, 2009.**

On February 28, 2008, Agent Jason Tyler with ICE, along with ICE officer Ledgerwood and officers with the Gwinnett County Police Department gang task force, including Sergeant Eric Osterberg, approached 1120 Forest Vale, Apartment 4, at about eight o'clock in the evening for a "knock and talk." [7, 26]. Defendant answered the door and allowed the agents and police officers to enter. [27, 45]. Two other males were inside. [13, 27-28]. Shortly after entry, Agent Tyler asked the occupants twice for permission to search the apartment. [30]. All three replied in the affirmative. [30]. Agent Tyler also advised them that they had the option to refuse to permit the search. [30].

After having obtained permission to search, Agent Tyler further asked Defendant if there was anything illegal in the apartment and Defendant disclosed that there was a .38 caliber pistol in the back bedroom between the mattresses. [30-31]. Sergeant Osterberg went

6

to the back bedroom and seized the pistol. [12, 31]. Defendant said that the pistol belonged to another guy who was not in the apartment at that time. [32]. The officers also found some ammunition and several drawings depicting gang paraphernalia, names and drawings. [12, 33]. Agent Tyler also asked Defendant about his involvement with the gang known as MS-13 and seized Defendant's cell phone. [34, 51-52]. The search of the apartment lasted about 20 minutes. [23, 33]. During this time, none of the occupants was restrained, nor were they given <u>Miranda</u> warnings. [33-34].

After speaking with the occupants and completing the search, Agent Tyler made the decision to determine the alienage of the three individuals in the apartment. [35]. Through questioning he determined that all three individuals were illegally in the country. [35]. At that point, fingerprint identification equipment was brought in before the three were taken into custody. [35]. The fingerprint identification revealed that Defendant had a pending order of removal; his brother Emerson, who was also present, was a previously deported aliens; and the third individual, Mr. Rivas, although illegal, did not have any previous removal history. [36]. All three were taken into custody at this time and were then taken to the Atlanta Detention Center. [36]. Agents Osterberg and Tyler estimated the total time in the apartment at 1 and ½ hours, including the immigration processing. [21, 23, 36]. Tyler

7

testified that it took 45 minutes to set up the fingerprint system. [37]. Thereafter, Defendant was removed and deported to El Salvador. [36, 37].

On December 8, 2009, Defendant was arrested again for illegal re-entry after deportation and was interviewed by Agents Tyler and Ledgerwood at the Gwinnett Precinct where Defendant was being held at the time. ICE Agents Tyler and Ledgerwood were there to pick Defendant up on an arrest warrant for federal charges. [38]. They interviewed him. [38]. At the outset, Agent Tyler read Defendant his Miranda rights, which he waved by signing a written form. [40]. See also Exhibit 4. This was done in Spanish by Agent Tyler. [39]. Neither Agent Tyler nor Agent Ledgerwood made any threats or promises in order to induce Defendant to make a statement. [83]. In the interview, Defendant was asked about his involvement with MS-13, as well as his illegal re-entry. [56, 85-86].

## C. Discussion

### 1. The February 28, 2008, Search and Seizure

As a preliminary matter, the Court concludes that Defendant and the other two occupants voluntarily consented to the entry of the officers and the search of the apartment. The evidence shows that Defendant assented to the officers' entry and that neither of the other two occupants objected. None of the circumstances surrounding the officers' entry indicates lack of consent or mere acquiescence

8

to a claim of lawful authority. See <u>United States v. Rios</u>, Nos. 10-11822, 10-12420, 2011 WL 4912074 at *4 (11th Cir. Oct. 17, 2011). As for the consent to search, Agent Tyler asked twice for consent, twice obtained an affirmative response, and specifically advised the occupants that they had the right to decline to consent to search. <u>Id</u>. As a factual matter, there is no evidence that Defendant did not voluntarily disclose the existence and whereabouts of the .38 caliber pistol that was seized from between the mattresses in the back bedroom. Indeed, Defendant concedes that he was not in custody at the time he made this disclosure. Def's Post-Hearing Brief at 11.

While the Court acknowledges that the pistol was not seized in plain view and that its incriminating character as evidence of crime or as contraband was not immediately apparent when the pistol was seized, the officers nonetheless were justified in seizing it at the outset and holding it, at least temporarily, until they finished searching the apartment and questioning its occupants. In that regard, the undersigned concurs with the sentiments expressed in <u>United States v. Malachesen</u>, 597 F.2d 1232, 1234-35 (8th Cir. 1979):

> Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer (here the inventory officer) seems a reasonable precaution to assure the safety of all persons on the premises during the search. A loaded, cocked handgun poses a threat to anyone within its range

9

of fire. Moreover, temporary seizure undercuts the chance
of mishap[,] the accidental discharge of the handgun
through mishandling by someone on the premises, or even
its intentional use by [Defendant]'s roommate or a cohort.
Common sense dictates that the weapon should be unloaded
and, at least temporarily, kept in a safe place.

In Malachesen, the weapon was temporarily seized in plain view but without its incriminating nature being immediately apparent. Thereafter, when the officers learned of Malachesen's prior felony conviction, "the temporarily-seized handgun became contraband and subject to seizure as an illegal weapon possessed by a felon." Id. at 1235. The same factual scenario is presented here.

While the seizure of the weapon in this case was not premised upon the plain view exception to the warrant requirement, the officers nevertheless became aware of the weapon lawfully by voluntary disclosure by Defendant. They were also possessed of consent to search the apartment, and there is no evidence the scope of the consent would not have included looking under the mattresses. Here, as in Malachesen, after the Defendant's illegal status was determined, the gun was likewise legally subject to seizure as contraband, evidence of the offense of illegal possession of a firearm. See United States v. Patel, No. 2:08-CR-210-WKW, 2010 WL 742983 *4 (M.D. Ala. Feb. 26, 2010) (seizure of firearm justified by later-discovered evidence of illegal immigration status).

10

Defendant argues that the officers did not contend that they felt their safety was of concern, pointing to the fact that the three occupants were not handcuffed or restrained and were allowed to move around the apartment freely during the search and questioning, up until they were arrested for immigration offenses. But these facts make it all the more prudent that any dangerous weapons, such as a pistol, should be seized temporarily and made safe while the officers were conducting their business, especially where the subject of the investigation was a violent street gang. Numerous cases under the plain view doctrine have recognized that "objects dangerous in themselves," such as handguns, may constitutionally be seized, at least temporarily. See Coolidge v. New Hampshire, 403 U.S. 443, 472 (1971) (suggesting that the plain view doctrine permits warrantless seizure of "objects dangerous in themselves"); United States v. Atchley, 474 F.3d 840, 850 (6th Cir. 2007)(citing Coolidge, 403 U.S. at 472); United States v. Robinson, 756 F.2d 56, 60 (8th Cir. 19985)(citing Malachesen, 597 F.2d at 1232); Patel, 2010 WL 742983 *4 (citing Malachesen).

Based upon the above authority and findings, the undersigned concludes that Defendant's Fourth Amendment rights were not violated when Officer Osterberg seized the pistol from under the mattress and held it while the occupants were questioned and it was determined that the occupants were illegal aliens chargeable with being aliens

11

illegally in possession of a firearm or ammunition under 18 U.S.C. § 922(g)(5). Once this status was determined and Defendants were arrested, then the pistol and ammunition were properly seizable as evidence or contraband. See, e.g., Patel, 2010 WL 742983 at *5.

On the other hand, while the government has defended the seizure of the pistol and ammunition, the government has made no effort to justify the seizure of any personal papers or drawings that may have been taken away from the premises. No probable cause has been shown to have existed for any such seizures, nor has the government argued that the incriminating nature of any of these items was immediately apparent. Under these circumstances, the motion to suppress should be **GRANTED** as to any other property seized and taken by the officers on February 28, 2008.[2]

### *2. Defendant's Statement Made on December 8, 2009*

As noted above, Defendant argues that his waiver of his Miranda rights and his statement made thereafter at the Gwinnett County Police Precinct on December 8, 2009, were not knowing and/or voluntary. Specifically, Defendant contends that his waiver of his rights was not knowing because Agent Tyler "failed to advise [Defendant] that he was actually pursuing a federal investigation of

---

[2] The government, as stated above, has already coonceded that the cell phone taken by Agent Tyler will not be sought to be introduced at trial. See Gov't Response Brief at 11 n.1.

12

the violent activities of MS-13." Def's Post-Hearing Brief at 19. In that regard, Defendant cites Carter v. Garrison, 656 F.2d 68 (4th Cir. 1981), for the proposition that, while police have no duty as a part of Miranda warnings to inform a suspect of the crime they are investigating, the suspect's ignorance of the subject of the interrogation should become part of the court's evaluation of the total circumstances of the waiver. Id. at 19-20. Defendant cites no Eleventh Circuit or Supreme Court authority on the point.

Under Miranda v. Arizona, 384 U.S. 436 (1966), before questioning a suspect in custody, law enforcement must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney during questioning, and that, if he cannot afford an attorney, one will be appointed for him. Miranda, 384 U.S. at 467-74. Miranda rights may be waived, however, id. at 475; but, even if Miranda warnings are given, evidence that is coerced must be excluded. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (dictum).

In general, the government must prove that the defendant voluntarily, knowingly, and intelligently waived his or her Miranda rights. Miranda, 384 U.S. at 475.

> The inquiry [into waiver] has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with

13

> a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon
> it.

Moran v. Burbine, 475 U.S. 412, 421 (1986).

Similarly, the voluntariness of a confession must be assessed under the totality of the circumstances, considering such factors as the defendant's intelligence, the length of detention, the nature of the interrogation, and the use of any physical force against the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (citations omitted). The inquiry focuses on whether the defendant's free will was overborne by any improper influence of law enforcement. Colorado v. Connelly, 479 U.S. 157, 170 (1986). See also United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (holding that in the context of voluntariness of consent to search, "the absence of official coercion is a *sine qua non* of effective consent") (citations omitted). "[A] confession induced by threats or promises is not voluntary." United States. v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983) (citing Bram v. United States, 168 U.S. 532, 542 (1897)).

Moreover, the fact that law enforcement agents are required to give Miranda warnings to defendants is not necessarily sufficient in all circumstances to ensure the voluntariness of a confession and therefore the voluntariness inquiry does not stop there. Dickerson v. United States, 530 U.S. 428, 444 (2000) (overruling 18 U.S.C.

14

§ 3501 because the long-standing precedent of <u>Miranda</u> affords greater protection of a suspect's rights). Nevertheless, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>Id.</u> (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984)).

The present case is not a case where Defendant's waiver of his <u>Miranda</u> rights was invalid, nor is it one of the rare cases where his statement was compelled despite compliance with <u>Miranda</u>. Defendant was interviewed, without handcuffs, at the Gwinnett Police Precinct by Agents Tyler and Ledgerwood. [42]. No weapons were displayed. [42]. The interview lasted approximately 30 minutes. [44]. Defendant was read his <u>Miranda</u> rights in Spanish and he was also provided a written copy of his rights to read. [39-40, 82]. He signed a written waiver. [40, 81]; <u>See</u> Ex. 3, 4. He did not appear to be under the influence of any drugs or medication that would impair his understanding and it appeared to the agents that he understood his rights. [43]. No threats or promises were made to induce him to waive his rights or to speak. [42-43, 83]. Nothing in the totality of the circumstances supports a finding that the waiver was not knowing, intelligent and voluntary or that the subsequent statement was in any way coerced.

The fact that the agents failed to inform Defendant that he was under investigation for gang-related federal crimes does not undermine the validity of the waiver or the statement in this case. As the Court stated in Moran v. Burbine, 475 U.S. 412, 422 (1986): "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." See also Colorado v. Spring, 479 U.S. 564, 577 (1987) (holding that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege"); United States v. Barner, 572 F.3d 1239, 1244 (11th Cir. 2009) (waiver valid despite Defendant's claim he was not fully advised of the crime about which he would be questioned). Here, as in Spring, "the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." 479 U.S. at 577.

In sum, the undersigned concludes that the waiver of Defendant's Miranda rights was knowing, intelligent, and voluntary, and that his statement was not coerced or involuntary. **IT IS RECOMMENDED** therefore, that the motion to suppress the December 8, 2009, statement be **DENIED**.

## V.
## Summary of Recommendations

In summary, the undersigned **RECOMMENDS** that the preliminary motion to dismiss, [368], be **DENIED**; that the motion for bill of particulars, [366], be **GRANTED in part**, with **DIRECTION**; and that the motions to suppress evidence, [389], and statements, [390], be **DENIED**, except as to any documents and other property seized on February 28, 2008, exclusive of the pistol and ammunition.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned, it is therefore **ORDERED** that this **DEFENDANTS** be and is hereby **CERTIFIED** as ready for trial.[3]

**SO REPORTED AND RECOMMENDED**, this 29th day of November, 2011.

    s/ *E. Clayton Scofield*
    E. CLAYTON SCOFIELD III
    UNITED STATES MAGISTRATE JUDGE

---

[3] This Court observes that this defendant have been indicted with additional defendants and that matters pertaining to such co-defendants are still pending. Pursuant to 18 U.S.C. §3161 (h)(7)(B)(ii) (the Speedy Trial Act), the time for commencing the trial of these defendants may be stayed until such time as all defendants have been certified ready for trial. Hence, it is not necessary to place the above-named defendant's case on the calendar for trial at this time.

17